

George C. Paine, II
US Bankruptcy Judge
Dated: 12/09/08



# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE

**In Re:**

BARNHILL'S BUFFETT INC.,
Debtor.

)
)
)
)
)

CASE NO. 07-8948
CHAPTER 11
JUDGE GEORGE C. PAINE, II

## MEMORANDUM

This matter is before the court on William Caldwell Hancock's application for allowance of compensation as attorney for the chapter 11 debtor, pursuant to 11 U.S.C. § 330. Objections to the fee application were filed by the United States Trustee and the Chapter 7 Trustee. Following a lengthy trial, and consideration of all proof, the court denies Mr. Hancock's fees in full, but grants his expenses in the amount of $1,071.55.

## PROCEDURAL  BACKGROUND

On December 3, 2007, Barnhill's filed a voluntary chapter 11 petition. At the time of filing, all of the Debtor's stock was held by an entity known as Dynamic Acquisitions Group, LLC. ("DAG"), and the Debtor operated twenty-nine buffet style restaurants in six states. In the Statement of Financial Affairs, W. Craig Barber is listed as the Debtor's President and Robert M. Langford is listed as the CEO and Director of the Debtor.

According to the Debtor's schedules, its major secured creditor, Wells Fargo

Bank, held a $23,256,526.00 claim secured by substantially all of the Debtor's assets, except the leasehold interests of the restaurant locations. The Debtor's total liabilities, including the amount owed to Wells Fargo Bank, was $27,576,894.00. The Debtor valued its assets at $3,661,333.00 on its bankruptcy schedules.

Following the filing of the petition on December 3, 2007, the Debtor obtained permission to continue using cash collateral on an interim basis and permission to continue its prepetition banking system.[1]  On December 13, 2007, the court entered an order establishing bidding and sales procedures for the sale of some of the restaurants. Shortly thereafter, the Official Creditors Committee was appointed, and Mr. Hancock filed his application for employment as attorney for the Debtor. On December 21, 2007, the court entered the Final DIP Financing Order.

On January 3, 2008, the Debtor filed its bankruptcy Schedules and Statement of Financial Affairs, and the Meeting of Creditors was held the following day. The Debtor received authority to continue use of cash collateral, and on January 28, 2008, the court entered the Order approving the Debtor's motion for the sale of sixteen of the Debtor's restaurants ("the Spirit I sale").

On February 1, 2008, the court entered another order authorizing the Debtor to use cash collateral through February 14, 2008. On February 12, 2008, the Debtor's motion to approve the sale of the four remaining restaurants ("the Spirit II sale") came before the court, but was denied. On February 15, 2008, the court entered yet another order authorizing the Debtor to use of cash collateral through February 29, 2008. On February 20, 2008, the Debtor's motion to finance insurance

---

[1] The Debtor's primary concentration account remained at Wells Fargo Bank.

was approved after a hearing.[2] During the third week of February, Wells Fargo Bank discovered that, sometime in late January, the Debtor had opened an undisclosed operating account at Renasant Bank which held approximately $400,000.00. The discovery of the undisclosed operating account at Renasant Bank initiated a dispute concerning the Debtor's continued use of cash collateral. On February 27, 2008, the motion to approve the Spirit II sale again came before the court. On February 29, 2008, the court entered the Order approving the Spirit II sale.

Following the approval of the Spirit II sale, the dispute concerning the use of cash collateral escalated, and the Debtor's authorization to use cash collateral expired. On February 29, 2008, Wells Fargo Bank transmitted a letter to Mr. Hancock advising the Debtor that its right to use cash collateral had expired. On March 4, 2008, Wells Fargo Bank filed an expedited motion to prohibit the Debtor's further use of cash collateral. The next day, Mr. Hancock filed an expedited motion seeking appointment of an Examiner to investigate the alleged fraud of Wells Fargo Bank. The Unsecured Creditors Committee then filed an expedited motion to appoint a chapter 11 trustee of convert the case.

On March 11 the motion to prohibit use of cash collateral came before the court, but Debtor's counsel was not present.[3] In the absence of Debtor's counsel, an agreement was reached by Wells and the Committee resolving the cash collateral issues. While Mr. Hancock was out of town on his honeymoon, the Committee,

---

[2]The insurance was set to expire and the motion to approve the new insurance was heard on an emergency basis.

[3]Mr. Hancock was out of town for approximately one week on his honeymoon in Hawaii. Although the expedited motion to appoint the examiner was filed on March 5, Mr. Hancock informed the court that he would be unavailable (with no counsel to substitute for him in his absence) until Monday, March 17, 2008.

Wells Fargo Bank and Performance Food Group ("PFG") (a creditor holding a significant PACA claim),[4] negotiated a global settlement of the case with the anticipation that the settlement would be submitted to a Chapter 11 or Chapter 7 trustee for approval. At the Debtor's request, the global settlement was amended to include the Debtor. Both Mr. Hancock and Mr. Barber signed the Global Settlement agreement on behalf of the Debtor.

On March 28, 2008, the Creditors' Committee requested an expedited hearing on its motion to convert or appoint a Chapter 11 trustee. On April 1, 2008, Wells Fargo filed an expedited motion to approve settlement of most issues in the case, and on April 8 the court approved the settlement (the "Global Settlement Order"). The Global Settlement Order provided, *inter alia* that the Debtor would file a notice of conversion on the second day after the funds relevant to the settlement were disbursed.

Mr. Hancock filed a motion to withdraw as Debtor's counsel on April 18, 2008. The transfers contemplated in the Global Settlement Order were consummated; however, Mr. Hancock as Debtor's counsel, did not file the notice of conversion. Rather, on April 23, 2008, Mr. Hancock filed a Rule 60(b) Motion seeking to set aside part of the global settlement he and his client signed. The court set the Committee's motion to convert the case, Mr. Hancock's motion to withdraw, and the Rule 60(b) motion for April 30, 2008. On April 28, 2008, Mr. Hancock filed a notice

---

[4] PACA is an acronym for the Perishable Agricultural Commodities Act of 1930, federal law ("PACA statute"), which provides a comprehensive scheme for the regulation of buyers and sellers of fruits and vegetables. A perfected PACA trust beneficiary is entitled to payment in full from the trust assets before payment to any other creditors, whether secured or unsecured. **See e.g., In re Long John Silver's Restaurants, Inc.**,230 B.R. 29 (Bankr. D.Del., 1999).

converting the chase to Chapter 7. Mr. Hancock did not appear at the April 30 hearing, and the court requested that counsel for the Unsecured Creditors' Committee submit the order terminating Mr. Hancock as Debtor's counsel. The order terminating Mr. Hancock as Debtor's counsel was entered on May 2, 2008.

Michael Gigandet was appointed Chapter 7 Trustee on April 30, 2008. On June 3, 2008, Mr. Hancock filed his first fee application requesting interim compensation in the amount of $355,975.00 and $1,071.55 for expenses from December 3, 2007 through February 29, 2008. On July 7, 2008, following the UST's objection to the Interim Fee Application, Mr. Hancock filed his First and Final Application for Allowance of Compensation requesting compensation in the amount of $356,554.50 and $1,071.55 for expenses. On July 17, 2008, Mr. Hancock amended the First and Final Fee Application and requested compensation in the amount of $371,896.00 and $1,071.55 for expenses. The UST and the Chapter 7 Trustee objected to the Amended Final Fee Application.

## OBJECTIONS OF THE UNITED STATES TRUSTEE AND CHAPTER 7 TRUSTEE

The United States Trustee ("UST") and Chapter 7 Trustee ("Trustee") raise four principal objections to Mr. Hancock's fee applications: (1) Mr. Hancock failed to comply with the disclosure requirements of Section 327 and Rule 2014 by failing to disclose his connections to interested parties, and he actively misrepresented his connections to interested parties; (2) Mr. Hancock engaged in abusive communication and litigation tactics that unnecessarily increased the legal fees in this case; (3) Mr. Hancock's fee application is excessive given his lack of records, seeking time billed outside his representation as chapter 11 Debtor counsel, and the disruption he caused in this case; and (4) Mr. Hancock has interfered with the

administration of the bankruptcy case by the Chapter 7 Trustee. Mr. Hancock contests all allegations raised by the UST and Trustee. The court addresses each of the objections in the context of the proof presented on each issue and the unique facts of this case.

## DISCUSSION

### A.    Disclosure Issues

The UST and Trustee objections allege that Mr. Hancock failed to comply with 11 U.S.C. § 327(a) and Federal Rules of Bankruptcy Rule 2014 and 2016 in that he failed to disclose his prior connections and lack of disinterestedness in his application to be employed as debtor's counsel. U.S.C. § 327(a) provides in relevant part:

§ 327. Employment of professional persons

(a) Except as otherwise provided in this section, the trustee, with the court's approval, may employ one or more attorneys, accountants, appraisers, auctioneers, or other professional persons, that do not hold or represent an interest adverse to the estate, and that are disinterested persons, to represent or assist the trustee in carrying out the trustee's duties under this title.

11 U.S.C. § 327(a). Disinterestedness is defined in 11 U.S.C. § 101(14) as:

(14) The term "disinterested person" means a person that—

(A) is not a creditor, an equity security holder, or an insider;

(B) is not and was not, within 2 years before the date of the filing of the petition, a director, officer, or employee of the debtor; and

(C) does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

Federal Rule of Bankruptcy Procedure 2014(a) provides in relevant part:

Rule 2014. Employment of Professional Persons
(a) Application for an order of employment.

An order approving the employment of attorneys, accountants, appraisers, auctioneers, agents, or other professionals pursuant to § 327, § 1103, or § 1114 of the Code shall be made only on application of the trustee or committee. The application shall be filed and, unless the case is a chapter 9 municipality case, a copy of the application shall be transmitted by the applicant to the United States trustee. The application shall state the specific facts showing the necessity for the employment, the name of the person to be employed, the reasons for the selection, the professional services to be rendered, any proposed arrangement for compensation, and, to the best of the applicant's knowledge, all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee. The application shall be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee.

Mr. Hancock filed his employment application and Rule 2014 Declaration on December 19, 2007. The application provides as follows:

4. To the best of the Debtor's knowledge, and as evidenced by the attached declaration of Wm Caldwell Hancock (the "Declaration") submitted pursuant to Fed.R.Bankr.P. 2014(a), neither Mr. Hancock nor any affiliate of the Hancock Law Firm holds or represents an interest adverse to this estate and all such persons are "disinterested" persons as defined in the Code. To the best of the debtor's knowledge proposed counsel has no present connection with the debtor (other than prepetition representation of the debtor in both bankruptcy and nonbankruptcy matters, which is not, per se, a disqualifying relationship) and no connection with any creditor or any other party in interest, their respective attorneys or accountants, the United States Trustee or any person employed in the office of the United States trustee. Mr. Hancock discloses that in 2002 through 2005 he represented Robert M. Langford, currently an officer, director and member of the debtor's management, in certain personal matters including litigated disputes. Those representations ended at that time. There was then, and is now, no relationship whatsoever between any matter involved in the former representation and the debtor or any entity relative to any matter involved in this case.

Paragraphs 2-5 of Mr. Hancock's Declaration provide as follows:

2. To the best of my knowledge, I am [a] "disinterested" person in this case, neither representing nor holding any interest adverse to the

estate in the matters upon which I am to be engaged.

3. To the best of my knowledge, no principal or affiliate of Mr. Hancock has any connection with the debtor, its creditors, or any other party in interest or their respective attorneys including the U.S. Trustee or any employee of the U.S. Trustee's Office in this District except that I have served as prepetition counsel to the debtor in bankruptcy and non-bankruptcy matters. In addition I formerly represented Robert M. Langford with regard to numerous personal matters during the period 2002 through 2005. That representation ended in 2005. None of the matters involved during that time period relate in any way to the matters to arise in this case under the proposed debtor representation.

4. I have agreed to represent the Debtor in this Chapter 11 case upon the terms and conditions set forth in the Debtor's Application and the attached Engagement Agreement.

5. In the year prior to the filing I represented the debtor in a number of matters including non-bankruptcy litigation in state Courts, corporate matters and as the debtor became demonstrably insolvent in the months preceding the filing, counseling the debtor's management regarding numerous pre-bankruptcy planning and strategy matters. The fees for those bankruptcy related and non-bankruptcy related services were paid as and when due and in full by application of retainers provided to the undersigned by the debtor via debtor checks and replenished as expended, in amounts totaling $50,000.00. The value of the services rendered during that time and as compensated by those retainers exceeds the retainer amounts available. Therefore, in order to avoid any conflicting interest that would preclude my employment as debtor's counsel in this case, I have irrevocably waived the unsatisfied claim for prepetition services.

Mr. Hancock's employment application and Declaration have not been amended. The UST and Trustee seek denial of applicant's fees based, in part, on Mr. Hancock's failure to disclose his representation and ties to three insider entities: Dynamic Management Group, LLC ("Dynamic Management"), DAG, and Dynamic Hospitality Hospitality, LLC ("Dynamic Hospitality"). Mr. Hancock contends that there was no relationship to disclose, and accordingly the objections should be overruled.

The UST elicited testimony and proof at trial showing the following in regard to the Dynamic entities:

| | |
|---|---|
| Dynamic Acquisition Group LLC: | The parent company of the Debtor; Craig Barber and Bob Langford have some ownership interest in DAG. DAG was formed in 2005 for the purpose of acquiring Barnhill's Buffet, Inc. in 2005. Listed as a Co-Debtor on Debtor's Schedule H. |
| Dynamic Management Group LLC: | A Tennessee limited liability company wholly owned by Craig Barber (50%) and Bob Langford (50%). Listed as a Co-debtor on Debtor's Schedule H. |
| Dynamic Hospitality LLC: | A Tennessee limited liability company wholly owned by Craig Barber (50%) and Bob Langford (50%). Dynamic Hospitality was listed as an insider receiving payments from the Debtor within one year of filing. Listed as a Co-Debtor on Debtor's Schedule H. |

The UST also produced a complaint filed in the Circuit Court in and for Escambia County, Florida styled *W.D. Sales and Brokerage, LLC v. Barnhill's Buffet of Tennessee, Inc. d/b/a Barnhill's Buffet, Inc. and Dynamic Management Company, LLC.* Within that lawsuit, Mr. Hancock wrote an e-mail, dated May 30 2007, to plaintiff's counsel asking for additional time for him to retain local counsel to assist him in the representation of the defendants (Barnhill and Dynamic). Local Florida counsel filed a motion accompanied by Mr. Hancock's sworn affidavit, dated some two months later (July 23, 2007) wherein Mr. Hancock stated:

2.  I represent Barnhill's Buffet, Inc., a Tennessee corporation (hereinafter "Barnhill's").

3.  I also represent Dynamic Management Company, LLC, a Tennessee limited liability company (hereinafter "Dynamic") which has no business relationship whatsoever with Barnhill's.

Affidavit of W. Caldwell Hancock, filed in *W.D. Sales and Brokerage, LLC v. Barnhill's Buffet of Tennessee, Inc. d/b/a Barnhill's Buffet, Inc. and Dynamic Management*

*Company, LLC*, 2007 CA 000862, (July 23, 2007).[5] Also in connection with this same lawsuit, the US Trustee introduced into evidence, legal bills of Florida local counsel for services up to and including September 30, 2007, paid by Barnhill's on behalf of Barnhill's and Dynamic referencing Mr. Hancock's involvement on such matters as correspondence, telephone conferences, summary judgment preparations, and deposition preparation.[6]

Mr. Hancock's testimony was that he represented Barnhill and Dynamic in the Florida litigation for a short time and for the limited purpose of finding local counsel. The affidavit was, according to Mr. Hancock, only for the purpose of getting a default judgment set aside, and he never thought to correct the error stating he represented Dynamic Management. He explained that the legal bills were in reference to his representation of Barnhill's only and not Dynamic Management.

Mr. Hancock has also held himself out as representing DAG. Craig Barber sent an e-mail dated March 23 2007, to Martin Moore of BBSA[7] in response to an inquiry about who represented Barnhill/Dynamic. Mr. Barber's e-mail stated that Caldwell Hancock was counsel for Barnhill and DAG relative to an issue concerning an Indemnification Fund. A month later, on April 25, 2007, Mr. Hancock wrote a letter

---

[5] The US Trustee also produced a transcript of a hearing in the Florida case wherein Mr. Hancock's sworn affidavit was discussed as representing both Barnhill and Dynamic. **Ex. 68.**

[6] The UST introduced several e-mails from Florida local counsel, after the bankruptcy filing had stayed the case as to Barnhill's that indicate Mr. Hancock's connection with Dynamic Management's representation. **See Exs. 136, 137.**

[7] BBSA, LLC ("BBSA") was appointed pursuant to a Merger Agreement as the Agent for the former shareholders' sale of their stock and warrants to the Debtor's last shareholders which occurred on or prior to February 11, 2005. An Indemnification Fund and an Escrow Account were established to secure certain obligations of the former shareholders to Barnhill's.

addressed to Mr. Moore at BBSA, saying he represented DAG. The US Trustee also produced an e-mail dated the very next day, that Mr. Hancock wrote to several people including Bob Langford and Craig Barber confirming that he had sent the letter about his representation and other matters to Mr. Moore.

Finally, with respect to Dynamic Hospitality, proof was adduced at trial of at least $17,675 in payments made by Dynamic Hospitality to Mr. Hancock since 2004. The payments were as follows according to Barnhill's Controller Stacy Gliexner's records:

| | | |
|---|---|---|
| 1/24/2004 | $10,000 | retainer for Dynamic Hospitality employees relative to PRG preference inquiry |
| 9/30/2004 | $2,500 | for payment to Randy Winston (to be distributed by Hancock Trust account) |
| 1/12/2004 | $5,015 | for payment to Randy Winston (to be distributed by Hancock Trust account) |
| 2/27/2006 | $160 | reimbursement for Hancock expenses |

Mr. Hancock testified that the first three payments were for his representation of several former Phoenix Restaurant employees ("PRG") who were defending preference actions. He further explained that while the entry says "retainer," the payments were actually used to settle those employee claims, and that he did the work *pro bono*. The last payment related to a deposition expense that remained outstanding from Mr. Hancock's prior representation of Bob Langford. Mr. Langford corroborated part of Mr. Hancock's testimony that the retainer related to the representation of former PRG employees that Dynamic Hospitality was paying for their legal representation. Mr. Langford, however, stated that Hancock was paid to represent these employees. Dynamic Hospitality was a creditor of Barnhill's at the

time the petition was filed.[8]

Mr. Hancock testified that he had learned the importance of full disclosure after his fees were denied in the "Phoenix Restaurant case" (**In re Innovative Entertainment Concepts, Inc**., 2007 WL 5582055 (Bankr. M.D. Tenn., Aug. 10, 2007; **aff'd Hancock v. Limor**, 2007 WL 4481436 (M.D.Tenn., Dec. 18, 2007)) for failing to fully disclose his fee arrangement as attorney for the Debtor.[9] However, despite the numerous inconsistencies uncovered by the US Trustee in this case, Mr. Hancock testified that he never amended his Rule 2014 Disclosure. In fact, when the US Trustee objected to Mr. Hancock's fee application based in part on failure to disclose, Mr. Hancock responded with an e-mail dated August 7, 2008 which provides in relevant part:

> I do not represent and have not represented Dynamic Management in any matter having anything to do with BBI, or in any other matter. . . . Bottom line: my disclosure is dead accurate and comprehensive and complete.

Just a few days later, Mr. Hancock prepared, but did not file, a Federal Rule of Bankruptcy Procedure 9011 motion for Sanctions against US Trustee Attorney, Lloyd Mueller and Chapter 7 Trustee, Michael Gigandet in connection with what he

---

[8] Any argument that Mr. Hancock's failure to disclose was a technical or insignificant mistake would be grossly understating the importance of full disclosure in this case. Both Mr. Barber and Mr. Langford collected their $275,000.00 annual salaries as long as the case remained pending under Chapter 11. One of their wholly owned company, Dynamic Hospitality, had a prepetition contractual relationship to the Debtor that continued as long as the case was pending under Chapter 11. Further, Mr. Barber testified that the Debtor did not perform a preference analysis while the case was pending under Chapter 11.

[9] In **Innovative,** the issue was whether Mr. Hancock candidly and fully disclosed the particulars regarding his retention as attorney for the Debtor, and whether any failure in this duty was more than merely technical. The court found that Hancock's "shifting disclosures" were the antithesis of candor and completeness and that his actions were willfully self-serving, and denied his fees. The decision was affirmed on appeal by the United States District Court.

considered baseless objections to his fee application.[10] Mr. Hancock transmitted the motion to Mr. Mueller and Mr. Gigandet and again reiterated that he had no connections with the Dynamic entities that he should have disclosed.

> As noted by the district court in the **Innovative** decision on appeal:
>
> > An attorney's obligations under the Bankruptcy Code, including those under the disclosure requirements for attorneys seeking employment and compensation in connection with a bankruptcy case, "[a]re fundamentally rooted in the fiduciary relationship between attorneys and the courts." **Downs**, 103 F.3d at 479. "[A]n attorney for a debtor-in-possession is an officer of the court and as such, unquestionably has a duty to be perfectly candid regarding his fitness to perform his duties." **In re Coastal Equities, Inc.**, 39 B.R. 304, 308 (Bankr.S.D.Cal.1984). Because the bankruptcy court must determine whether the attorney holds any interest adverse to the estate, the attorney has the duty to disclose all connections with the debtor, creditors and any other party in interest, not just those whom the attorney selects as consequential. **Id.** at 308 **(citing In re Haldeman Pipe & Supply Co.**, 417 F.2d 1302, 1304 (9th Cir.1979); **In re Arlans Dept. Stores, Inc.**, 615 F.2d 925, 932 (2d Cir.1979)). Further, the Bankruptcy Code does not permit a court to "[a]pprove the employment of a person who is not disinterested, even if the person does not have an adverse interest." **Childress v. Middleton Arms, L.P. (In re Middleton Arms, L.P.)**, 934 F.2d 723, 725 (6th Cir.1991).

**Hancock v. Limor**, 2007 WL 4481436 at *6 (M.D.Tenn., Dec. 18, 2007). Mr. Hancock's disclosures in this case were just as his disclosures in the **Innovative** case: "shifting where candor was required." As a result, Judge Lundin denied Mr. Hancock's fees in full in August 2007.[11] Just a few months later, Mr. Hancock filed

---

[10] Mr. Hancock explained that a rule 9011 motion was an "effective tool" and that he intended to file it if he did not get the results he was seeking to achieve. He called such a tactic a "shot across the bow." He also testified that he believed motions such as this as well as reminders of criminal statutes were methods of "getting a case going."

[11] Judge Lundin's ruling in **Innovative** could apply equally in this case:

> The Trustee and U.S. Trustee have had to claw the facts out of Hancock. And there were good reasons to do so. Hancock's serial disclosures were not consistent with each other. Some of the disclosures raised issue[s] with respect to Hancock's disinterestedness. The timing of the shifting explanations seemed opportunistically to respond to challenges from the

13-U.S. Bankruptcy Court, M.D. Tenn.

his employment application and required disclosures in the Barnhill's bankruptcy case, and again chose to be conservative in his disclosures. Worse still, when pressed on the issue, instead of amending his disclosures, especially in light of his recent fee denial, he instead chose to deny his relationships and became combative with the UST and trustee.[12]

Mr. Hancock's failure to disclose information interfered with the court's ability to make an informed decision of whether his employment as Debtor's counsel complied with the Bankruptcy Code and Rules. "If the duty to properly disclose is neglected, however innocently, the attorney performs services at his peril." **In re Coastal Equities, Inc**., 39 B.R. at 308. (**citing In re Rogers-Pyatt Shellac** Co., 51 F.2d 988, 991 (2d Cir.1931)).

On the disclosure issues alone, the court denies all fees sought by Mr. Hancock. His testimony at trial attempted to explain away whatever the proof showed otherwise. The court agrees completely with Judge Lundin's characterization of Mr. Hancock's disclosure as "shifting." If Mr. Hancock did not represent Dynamic Management, Dynamic Hospitality, or DAG, or even if he did, why wouldn't full disclosure have been made in order avoid even an appearance of

---

Trustee and the U.S. Trustee. The result is long and expensive litigation to get what Hancock was obligated to give in the first instance without compulsion: complete and accurate disclosure. . .

**In re Innovative Entertainment Concepts, Inc**., 2007 WL 5582055 (Bankr. M.D. Tenn., Aug. 10, 2007; **aff'd Hancock v. Limor**, 2007 WL 4481436 (M.D.Tenn., Dec. 18, 2007).

[12]When the parties were nearing the contested hearing, Mr. Mueller asked Mr. Hancock about stipulating with regard to the Florida affidavit's authenticity. Within that exchange of e-mails on that one day (October 8, 2008), Mr. Hancock made such comments to Mr. Mueller as: "If you want it [affidavit] in you provide it. I don't have time to do your work for you," and "[s]ometimes I wonder whether there are any adults other than me in this matter," and "you are now playing a childish game. . . ."

impropriety? The evidence and testimony at trial cast Mr. Hancock's conduct and testimony as defensive and reactive to issues on which he was "caught." The court cannot award fees to a fiduciary of the court who has failed to properly disclose, even if by neglect, and given Mr. Hancock's history of disclosure issues in the past, he should have gone out of his way to make every possible disclosure. The trustee and UST should not have to be justice's pliers having to painfully extract disclosure which should be freely given. Mr. Hancock's failure to strictly comply with 11 U.S.C. § 327 and Bankruptcy Rule 2014 warrants denial of all fees in this case.

Even though the court finds that the disclosure violations alone are enough to deny Mr. Hancock's fees in full, the court nonetheless must address the other issues which likewise warrant a full denial or at the very least, a substantial reduction, of Mr. Hancock's fees.

## B.    Abusive Conduct

In order to award Mr. Hancock the fees he seeks, the court looks to 11 U.S.C. § 330(a).[13] Section 330(a) proscribes what compensation is allowed to professional

---

[13] § 330.    Compensation of officers.
(a)    (1)    After notice to the parties in interest and the United States trustee and a hearing, and subject to sections 326, 328, and 329, the court may award to a trustee, an examiner, a professional person employed under section 327 or 1103—

(A)    reasonable compensation for actual, necessary services rendered by the trustee, examiner, professional person, or attorney and by any paraprofessional person employed by any such person; and

(B)    reimbursement for actual, necessary expenses.

(2)    The court may, on its own motion or on the motion of the United States Trustee, the United States Trustee for the District or Region, the trustee for the estate, or any other party in interest, award compensation that is less than the amount of compensation that is requested.

persons employed under section 327. A standard of "reasonableness" governs the awarding of fees. **In re Holder** 207 B.R. 574, 580-581 (Bankr. M.D.Tenn., 1997). In this circuit, lodestar analysis regulates compensation of bankruptcy professionals. **Boddy v. United Sates Bankruptcy Court**, 950 F.2d 334, 334 (6th Cir. 1991). The lodestar method directs a court to multiply the reasonable hourly rate by the hours reasonably expended in performance of actual and necessary services. **Id**. A reasonable hourly rate should be determined based on "the amount involved, customary fees, the level of skill required, reputation of the applicant, time limitation, whether the fee is contingent or fixed, and the case's undesirable aspects, if any." **In re Crabtree**, 45 B.R. 463 (Bankr. E. D. Tenn. 1984); **In re Boddy**, 950

---

(3)    In determining the amount of reasonable compensation to be awarded, the court shall consider the nature, the extent, and the value of such services, taking into account all relevant factors, including—

(A)    the time spent on such services;

(B)    the rates charged for such services;

(C)    Whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D)    whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and

(E)    whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

(4)  (A)    Except as provided in subparagraph (B), the court shall not allow compensation for—
(i)    unnecessary duplication of services; or
(ii)    services that were not—
(I)    reasonably likely to benefit the debtor's estate; or
(II)    necessary to the administration of the case

11 U.S.C. § 330.

16-U.S. Bankruptcy Court, M.D. Tenn.

F.2d at 337; **In re Southern Industrial Banking Corp**, 41 B.R. 606 (Bankr. E.D. Tenn. 1984); **In re Holder**, 207 B.R. 574 (Bankr. M.D. Tenn. 1997).

In this case, the US Trustee and trustee allege that Mr. Hancock engaged in abusive communication and litigation tactics that unnecessarily increased the legal fees throughout the case. Based on his behavior and dilatory practices, the US Trustee and trustee seek to deny his fees. The US Trustee's proof included insults, threats, improper posturing, unexplained silences, and attempted intimidation of nearly every attorney involved in this case. The court heard proof about numerous instances of Mr. Hancock's unprofessional and at times rude conduct to counsel for Wells Fargo, counsel for the Official Committee of Unsecured Creditors, the United States Trustee and the Chapter 7 trustee. Some of the examples of Mr. Hancock's abusive and disruptive behavior include:[14]

> (1)    Mr. Hancock, without basis, threatened Creditors Committee counsel with criminal sanctions;[15]
>
> (2)    Mr. Hancock accused Wells Fargo counsel of fraud;
>
> (3)    When the US Trustee and trustee objected to his fee application, Mr. Hancock prepared and sent a Rule 9011 Motion charging them with misconduct (never filed);
>
> (4)    When he grew angry at Wells Fargo's control over the bank's control of their cash collateral, Mr. Hancock filed a motion seeking to appoint an examiner against Wells, even though the code has no provision for

---

[14] The court chooses not to reproduce or paraphrase the abusive communications of Mr. Hancock in order to minimize the further embarrassment or discomfort of all subpoenaed parties reluctantly involved in this contested fee application hearing. All exhibits presented at trial amply support the court's findings.

[15] Mr. Hancock's defense for this threat was that it was meant to be a friendly gesture to keep counsel from getting into trouble. No one else who testified in this case took Mr. Hancock's threats as "friendly advice," but rather as threats and attempted intimidation under the veil of advocacy. The threat of criminal sanctions is another of Mr. Hancock's litigation strategies. The court heard proof of other instances where this "tactic" was employed.

such;

(5) When he wanted to disrupt the "global settlement" order that he signed off on agreeing to case conversion, Mr. Hancock filed but did not prosecute a Rule 60 Motion to set aside the settlement.

(6) Mr. Hancock's attempted manipulation of opposing counsel by threatening professional responsibility violations concerning direct communication with Mr. Barber when Mr. Barber was routinely included on all e-mail traffic, and Mr. Hancock at times requested counsel to communicate with Mr. Barber while he was out of town.

Mr. Hancock spared almost no professional in this case his obstreperous tactics. Mr. Hancock's testimony about these incidents convinced the court that he does not see any fault in his actions. He admitted the heated nature of the case at times, but his testimony indicates that he believes his actions were beneficial to the case. The court finds to the contrary.

The testimony of counsel for Wells Fargo, the Creditors Committee, along with the proof of the United States Trustee were correspondent and credible in their explanation of Mr. Hancock's conduct. No professional in the case viewed his behavior as "helpful," "friendly, or "beneficial." In fact both Committee counsel and Wells Fargo counsel estimated Mr. Hancock's participation in this case increased overall costs of the case by as much as $75,000.00, and that approximately one-half of all fees billed at the conclusion of the chapter 11 were billed because of Mr. Hancock's conduct.

The court cannot find, based on the extensive proof of Mr. Hancock's unprofessional, dilatory actions and his fractious behavior that his services as Debtor's counsel were reasonable and necessary pursuant to 11 U.S.C. § 330. Many of the actions taken by Debtor's counsel appeared to be designed to frustrate the legitimate rights of the other parties in this case. Virtually every exhibit introduced

presented additional evidence of inappropriate actions by counsel.  The overall course of this case has been contentious, disorganized and wasteful of the time and efforts of both this court and other counsel.

Thus, in addition to Mr. Hancock's failure to make proper disclosure, Mr. Hancock's disruptive conduct requires denial of his fees.  Mr. Hancock's conduct fell severely below the minimum standard for attorneys practicing in this court.  While the court does not question Mr. Hancock's keen intellect and understanding of bankruptcy law, it is troubled deeply by his behavior in this bankruptcy case.

### C.    Excessive or Incomplete Billing, and Disruptive Practices

The US Trustee and trustee also object to Mr. Hancock's fee application based on several other grounds: (1) his failure to maintain contemporaneous records to substantiate his billings, and/or failure to otherwise provide evidence to support his time entries; (2) Mr. Hancock's overbilling of the estate as to hours worked; and (3) Mr. Hancock's actions wherein he appears to intentionally obstruct progress of the case.  Mr. Hancock's response to each of these allegations is discussed herein.

### 1.    Billing Issues

On June 3, 2008, Mr. Hancock filed his first fee application requesting interim compensation in the amount of $355,975.00 and $1,071.55 for expenses from December 3, 2007 through February 29, 2008.  On July 7, 2008, following the UST's objection to the Interim Fee Application, Mr. Hancock filed his First and Final Application for Allowance of Compensation requesting compensation in the amount of $356,554.50 and $1,071.55 for expenses.   On July 17, 2008, Mr. Hancock

amended the Final Fee Application and requested compensation in the amount of $371,896.00 and $1,071.55 for expenses.

The UST argues that Mr. Hancock's fee application contains numerous entries that strain credulity as to the hours billed. In the June 3, 2008 fee application, Mr. Hancock's application contained:

| Billing More than: | 10 hours /day | 54 days |
|---|---|---|
| | 15 hours /day | 32 days |
| | 20 hours /day | 17 days |
| | 24 hours /day | 2 days |

Only after the UST objected, did Mr. Hancock amend his fee application and reduce the amount sought by $55,226.[12] The amended fee application contained:

| Billing More than: | 10 hours /day | 51 days |
|---|---|---|
| | 15 hours / day | 25 days |

Mr. Hancock relied upon several witnesses to testify that he worked long, and sometimes unusual hours. The court does not doubt the veracity of any of these witnesses, nor that Mr. Hancock perhaps expended long hours on many days during the pendency of this case. However, the court must consider the hours spent in light of Mr. Hancock's conduct as the leading cause of these lengthy time entries. Mr. Hancock's reaction to the UST and trustee objections is just that: reaction to getting "caught." Absent the diligence of the UST and trustee, Mr. Hancock would

---

[12] Mr. Hancock's first fee application sought to bill the estate $125 per hour for a paralegal that Mr. Hancock hired on a contract basis and paid no benefits on her behalf. Testimony at trial indicated that Mr. Hancock actually paid this paralegal $25 per hour for her work. After the UST and trustee objections to the fee application were filed, Mr. Hancock testified that he "voluntarily" cut back fees sought for the paralegal to $1,500 even though she was paid, by his testimony over $5,000. The paralegal herself testified that Mr. Hancock paid her "a couple of thousand dollars."

20-U.S. Bankruptcy Court, M.D. Tenn.

have overbilled for at least $55,226.[13]

The UST and trustee also point out that the contemporaneous time records produced by Mr. Hancock to support the post-petition fees are woefully inadequate. Mr. Hancock and his paralegal testified that beginning around May 2008, he began dictating time entries for the work he performed since the beginning of the case. He would send to the dictation to the paralegal for entry into a spreadsheet. Thus, the dictations, which were mostly chronological, for December 2007 through May 2, 2008, were not contemporaneously dictated to the paralegal, but were instead "reconstructed" after the fact to create contemporaneous time records. Mr. Hancock explained that he composed the dictation based on notes he made during the "real time" representation, but that most of these notes had been discarded by his paralegal after she performed the dictation.[14] He produced only seven (7) handwritten chargeable time slips reflecting hours; his telephone records, a log showing his e-mail traffic from December 3, 2007, to December 14, 2007 and the Docket Sheet for the case.

Mr. Hancock was well aware of his responsibility to keep contemporaneous time records to support his fee application. Recreated time logs based on dictation that occurred well after events had occurred are not "contemporaneous." It is Mr.

---

[13]Mr. Hancock testified his first fee application contained accidental mistakes. However, the court cannot accept such negligence from officers of the court expecting payment. Mistakes are inevitable but given Mr. Hancock's past dealings with issues just such as this, it is inconceivable to the court that he did not expend more care in submitting an accurate fee application.

[14] The paralegal testified that she did not discard any notes because she was not given any.

Hancock's burden pursuant to 11 U.S.C. § 330 to show his entitlement to the fees requested, and his inadequate time records would provide yet another basis to, at the very least, to substantially reduce the fees he seeks.

Also troubling was Mr. Hancock's failure to keep proper records to justify the $50,000 prepetition amount that Mr. Hancock disclosed was paid to him by the Debtor. Mr. Hancock's Federal Rule 2014 and 2016 Disclosures state that he received retainers totaling $50,000 for work performed for the Debtor prior to filing, and that he provided services in excess of the retainer amounts. When the trustee asked Mr. Hancock to produce time records to support the work performed against the $50,000 retainers, Mr. Hancock responded by e-mail that:

> I am unable to find any such papers. Given the practice we followed over the years I suspect there might not be any. That would be ordinary course for us. Bob [Langford] doesn't like to see lawyers bills and I don't like the time and expense of preparing them so its quid pro quo.

Mr. Hancock has failed to produce even the billing statements required to justify the $50,000.00 he received from the Debtor during the months before the case was filed. This is simply unacceptable practice for a Debtor's attorney seeking payment in a chapter 11 case.

### 3.    Disruptive Behavior

Although the court has discussed herein Mr. Hancock's abusive tactics with other professionals in this case, the UST and trustee raise other troubling conduct

by Mr. Hancock that the court is compelled to address. These specific issues relate to: (1) opening of a DIP account in "secret"; (2) failure to timely respond to opposing counsel; and (3) conduct during certain hearings throughout the case.

On January 28, 2008, when the Spirit I sale was closing, but the remaining stores were unsold and the Debtor's insurance was about to lapse, the Debtor opened a new operating account at Renasant Bank.[15] Mr. Hancock and Mr. Barber testified that the intention was to keep Wells Fargo from interfering with money so that they could pay the bills of Barnhill's. The Debtor's Renasant Bank records show two wire transfers into the operating account in the amount of $400,000 on January 28, 2008 and $100,000 on February 8, 2008. The Debtor's Bank of America account shows debits in equal amounts on those same date. Mr. Barber and Mr. Hancock agreed that the transfers came from the Bank of America account, but they testified that the funds were approved borrowings under the post-petition DIP loan. Both Wells Fargo and the UST contended that the funds were proceeds of store operations since no matching records showing a draw down on the DIP loan were produced. Either way, the funds were transferred into the Renasant Bank account without knowledge of, or permission from, Wells Fargo and without the permission of the UST. In fact, the UST's proof shows that Renasant Bank was not even a UST approved depository on the date the account was created and the first funds transferred.

---

[15] Actually, three accounts were opened on January 28, 2008 at Renasant Bank. The first account held escrowed funds pending the outcome of litigation with SCS Contractors, Inc. The second fund was opened to hold the sale proceeds from the Spirit I sale, and the third account, unbeknownst to Wells Fargo, was a new DIP operating account.

The UST, Wells, and Creditors Committee began referring to the Renasant account as the "secret account," and the court agrees with that characterization. Even after the account's existence was discovered, Mr. Hancock continued to keep Wells and the Committee guessing as to where those funds had come from and where they were being spent. According to counsel for Wells Fargo's credible testimony, Wells discovered the "missing money" when checks were being presented to Wells for payment and insufficient funds were in the Wells account to cover the checks. By mid-February, Wells thought $500,000.00 was missing and Mr. Hancock and Mr. Barber did nothing to allay those suspicions other than telling Wells that the "secret account" existed.[16]

Wherever the truth lies as to the reasons for the secret account, where the funds came from, whether it was intended to be "secret'" or not, the entire discussion is just one further example of Mr. Hancock's intractable conduct that generated fees and problems in this case rather than progress, professionalism, and transparency that is expected of a chapter 11 Debtor's attorney.

In addition to the "secret account" debacle, there were countless "incidents" where Mr. Hancock either did not timely respond to counsels' requests for information, did not return calls or e-mails, left town without making arrangements

---

[16] The Debtor's monthly operating report for this time frame does not disclose the "secret account." It shows the money going out of the Bank of America account but not where the money went.

for communications about the Debtor's affairs, or simply did not show up hearings. Mr. Hancock filed objections and motions without pursuing them. Counsel for Wells Fargo and counsel for the Creditors Committee testified concerning unanswered phone calls and e-mails when crucial deadlines were impending. Mr. Hancock left to go out of town with no other lawyer to handle matters in his absence.[17] The Debtor was unrepresented at certain hearings. Mr. Hancock, by the credible testimony of at least two other attorneys in this case, appeared to have stormed out of an important hearing in anger leaving the Debtor without counsel.[18] These examples of disruptive behavior are not an exhaustive list. Such behavior cannot be rewarded by payment of fees billed by Mr. Hancock at $350 per hour when his conduct created so many of the unnecessary billings in this case.[19]

## CONCLUSION

Whatever benefit Mr. Hancock provided in this case was completely eradicated

---

[17] Mr. Hancock's departure actually facilitated the "global settlement" of all issues in the case according to the testimony of both counsel for Wells and counsel for the Committee. Upon his return from out of town, the Debtor was allowed to join the settlement, but then later sought to set it aside as further disruption.

[18] Mr. Hancock testified he did not leave, but merely stepped across the hall to a conference room to prepare his case. Apparently Mr. Hancock was the only person who understood his actions so innocently.

[19] The court took under advisement the admissibility of Exhibits T, U, V, and W offered by Mr. Hancock during his rebuttal testimony. While the court tends to agree with the UST that these exhibits should have been included on Mr. Hancock's pretrial disclosures, the court will overrule the objection of the UST and allow the admissibility of the exhibits so that Mr. Hancock knows that the admissibility of those exhibits did not otherwise impact the court's decision.

and overcome by his unprofessional conduct and tactics. The court must deny all of Mr. Hancock's fees for his failure to make proper disclosure and/or his unfortunate conduct. The court is saddened by Mr. Hancock's apparent inablity to either realize or control his inappropriate actions, and his propensity for conservative disclosures rather than overt transparency. The court, therefore, DENIES Mr. Hancock's fee application in full. The court will award reimbursement of his expenses in the amount of $1,071.55.

The court instructs counsel for the US Trustee to prepare an order denying Mr. Hancock's fees, awarding Mr. Hancock's expenses in the amount of $1,071.55, and ordering the remainder of the "carved out" fees returned to Wells Fargo.

**THIS MEMORANDUM WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

This Order has Been electronically signed. The Judge's signature and Court's seal appear at the top of the first page.
United States Bankruptcy Court.